1

Honorable ROBERT J. BRYAN

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

9

10

NATHEN BARTON,

CASE NO. 3:21-cv-05338-RJB

11

                              Plaintiff

        v.

MOTION FOR SUMMARY
JUDGEMENT ON
COUNTERCLAIM

12

SERVE ALL, HELP ALL, INC.; and
JOHN DOE 1-10,

13

                              Defendants.

NOTED FOR:
JANUARY 27, 2023
ORAL ARGUMENT REQUESTED

14

15

        Plaintiff Nathen Barton moves the Court for Summary Judgement on Serve All, Help All

16

Inc's ("SAHA") counterclaims.

17

        SAHA searches public records for struggling homeowners they believe will be receptive

18

to their services.  This lawsuit is about consent – SAHA says they can robocall without it:

19

        "Because we were sending a solicitation from a non-profit organization, it is our
        understanding we did not need consent;"  Exhibit A, page 2, lines 4-5.

20

        This is simply wrong.

21

        "It shall be unlawful for *any* person . . . to make *any* call (other than a call made . . . with
        the prior express consent of the called party) using any automatic telephone dialing
        system or an artificial or prerecorded voice . . . to any telephone number assigned to a
        paging service, cellular telephone service."  47 U.S. Code § 227(b).  Emphasis added.
        Non-profit organizations are not exempt from the Telephone Consumer Protection Act,
        RCW 80.36.400, or RCW 80.36.390.

22

23

24

1    SAHA thought William Wilder's ("Mr. Wilder") distressed real estate made him a

2  potential customer.  They blasted over five dozen phone numbers to reach him – anyone's phone

3  number associated with the property.  One of those numbers was Barton's – (360) 910-1019.

4  They thought there was a 3% chance Mr. Wilder's *son* used this phone number and that was

5  enough for SAHA to robocall it.

6    They don't really believe they can robocall without consent, so they are cagey on the

7  phone.  Their robocalls don't mention the entity behind the call (see Exhibit B ¶7), and their

8  phone agents use "Nonprofit Alliance" instead of their actual business name or registered *d/b/a*

9  Nonprofit Alliance of Consumer Advocates.  This is legally insufficient.  The FCC requires

10  telemarketers to identify their actual business name.

11    SAHA only has one reason to hide their identity.  They know their calls are illegal.  What

12  legal business don't want consumers to know who they are talking to?

13    SAHA is exactly why the TCPA was enacted.  Plaintiff believes he received over a dozen

14  robocalls from them, and SAHA was robocalling over five dozen phone numbers trying to reach

15  *one man*.  Because Mr. Wilder's financial distress might make him receptive to their solicitation.

16    The third circuit held 'we reiterate that the [TCPA] statute is remedial in nature and

17  "should be construed to benefit consumers."'[1]  This Court should protect consumers from

18  telemarketers like SAHA.

19  ### SAHA Blasted Dozens of Phone Numbers

20    Pepe Abad testified (Exhibit C) that when they find a potential customer, *they pull all the*

21  *phone numbers connected to that real estate and they call them all*:

22    "Then we obtain client contact information from various search engines . . . this provides
23    us all 'known' associated mobile phone numbers associated with that property address . . .

24  ---
[1] *Daubert v. NRA Grp., LLC*, 861 F.3d 382, 390 (3d Cir. 2017)

MOTION FOR SUMMARY JUDGEMENT - 2 / 16                    NATHEN BARTON
CASE NO 3:21-CV-05338-RJB                                4618 NW 11TH CIR
                                                         CAMAS WA 98607

1

2

We send . . . SMS messages to each record with brief information on our free loan modification services". Exhibit C, page 1, lines 18-21

3

4

In discovery, SAHA turned over the names and phone numbers of the people associated with the property address (Exhibit J) – 4738 Bellwood Dr Ne[2].

5

6

Exhibit J lists 65 phone numbers associated Bellwood Dr and according to Abad's process he testified to in Exhibit C, they all got called in their quest to reach Mr. Wilder.

7

Duncan testified (Exhibit B ¶10) that:

8

9

10

"Further, in reviewing data, I noticed something when I looked at the original data file [Exhibit J]. *It looks like the number 3609101019 was actually William's son's mobile number, Kevin Gene Wilder*. And I believe that we do various free searches on the internet for the names & phone numbers of all the addresses residents due to the time sensitivity of the pending foreclosure." Emphasis added.

11

This again matches Exhibit J – a search for "3609101019" shows that phone number is

12

associated with Kevin Gene Wilder. Along with 11 *other* phone numbers[3].

13

14

15

**This is a critical detail in the lawsuit. SAHA didn't mistakenly solicit Barton thinking they were soliciting Mr. Wilder. SAHA willfully and knowingly blasted the phone number they knew *didn't* belong to Mr. Wilder in the hopes it *might* lead to Mr. Wilder.**

16

17

SAHA blasted over five dozen phone numbers with robocalls because they wanted to sell Mr. Wilder a mortgage. Most appalling is the next to last column in Exhibit J, <u>a percentage</u>.

18

19

20

21

This percentage is an indication of how likely the phone number is associated with the person. SAHA's own data said if they dialed (360) 910-1019, there was only a 3% chance they would reach the *son* of the man they really wanted to speak with to sell him a mortgage, and they decided it was a good idea to robocall it many times.

22

23

[2] Search Exhibit J for "William Wilder". The address associated with"William Wilder" is 4738 Bellwood Dr Ne.

24

[3] Exhibit J lists phone numbers 3609101019, 5032531563, 5033587789, 5034921756, 5035058602, 5035440473, 5036532697, 5036699152, 5036740325, 5036746650, 5037361399, 5413013149 with Kevin Gene Wilder.

MOTION FOR SUMMARY JUDGEMENT - 3 / 16                    NATHEN BARTON
CASE NO 3:21-CV-05338-RJB                                        4618 NW 11TH CIR
                                                                          CAMAS WA 98607

1    SAHA is exactly the reason the TCPA was enacted – to stop telemarketers from blasting

2  over five dozen phone numbers in search of one man.  And to stop them from doing so

3  anonymously.

4                                          **Questions**

5  • Suppose a tax specialist finds the name and address of a lottery winner from public

6     records.  Can the tax specialist legally robocall all the people connected to the winner in

7     the hopes of reaching the winner?

8  • The FCC and various courts in the ninth circuit say that recipients of unwanted telephone

9     solicitations have no legal duty to mitigate TCPA statutory damages.  If the tax specialist

10     reaches Barton instead of the lottery winner, is Barton obligated to quickly hang up the

11     phone or tell the tax specialist they have the wrong person?  Is Barton allowed to

12     converse with the tax specialist to investigate the people responsible for the illegal call?

13  • If the tax specialist falsely claims to be business "Lottery Tax Consultants" and a call

14     recipient then consented to more calls, did the recipient consent to future calls from

15     Lottery Tax Consultants, or the tax specialist?

16  • If the tax specialist must obtain *prior* consent before placing the first telephone call (and

17     using artificial or prerecorded voice), can a call recipient give it *during* the call?

18        **SAHA's Claim that Barton "opted in" on a Website is Wrong**

19  On June 23, 2022, SAHA filed a counterclaim in Dkt. 82 alleging:

20  "SAHA is informed and believes and thereon allege that Counterdefendant NATHEN
   BARTON in or about February opted into a marketing campaign to receive
21  communication from an entity operated or represented by the Counterclaimants or one of
   its affiliates." *Id* at ¶3.4.
22

23

24

MOTION FOR SUMMARY JUDGEMENT - 4 / 16                     NATHEN BARTON
CASE NO 3:21-CV-05338-RJB                                 4618 NW 11TH CIR
                                                          CAMAS WA 98607

"Counterdefendant NATHEN BARTON opted in to receive information from SAHA or one of their affiliates by providing his phone number. Unfortunately, the Complaint does not specify which number that is." *Id* at ¶3.5.

They knew this was false before they filed Dkt. 82.[4]  Now they openly admit it:

- "The information obtained from Non Profit Alliance/SAHA is received by me from Pepe Abad. He obtains the information from public data bases.".  Exhibit B ¶5.

- "When I was originally asked for information regarding the calls that are the subject of this lawsuit, I originally stated it was from one of our websites. . . . By the time I had realized it was . . . not a web posting, the attorney had already submitted an answer."  Exhibit B ¶9.

- Pepe Abad testified: "I obtain Public record Data from Property Radar on all properties with Notice of Defaults and Notice of Trustee Sales".  Exhibit C, page 1, lines 15-16.

- "Then we obtain client contact information from various search engines . . . this provides us all 'known' associated mobile phone numbers associated with that property address . . . We send . . . SMS messages to each record with brief information on our free loan modification services".  Exhibit C, page 1, lines 18-21.

- See also their answer to Interrogatory 21 (Exhibit A):

> **INTERROGATORY NO. 21:** You have said that you acquired phone number (360) 910- 1019 from a vendor who obtained the number from public records. What information do you have about when these public records were first published?
>
> **ANSWER** See attached declaration of Pepe Abad.

- Abad's declaration is Exhibit C.  See also Exhibit D –  Barton asks SAHA for many documents and SAHA gives identical or nearly identical responses:

---

[4] Opposing Counsel testified: "Essentially, they believe the phone number in question was purchased from a marketing company who provides leads regarding people facing foreclosure, and that the number was, at the time of receipt, assigned to someone other than Mr. Barton." Dkt. 57, 2:21-23

> **PRODUCTION REQUEST NO. 1:** In Paragraph 3.2 of Dkt 46 you state: "Counterdefendant NATHEN BARTON opted in to receive information from SAHA or one of their affiliates by providing his phone number"   Produce any and all documents of this allegation Barton "opted in".
>
> **RESPONSE:  We will seek amend our answer and counterclaim with information based on our research.   There is nothing specific to Mr. Barton as the initial contact was meant for William Wilder who was associated with the phone number at the time we received information.**

## Housekeeping – The Burden of Proof on Express Consent

This section will be referred to later in the Motion.  Express consent in the 9th circuit is not an element of a plaintiff's *prima facie* case but is an affirmative defense for which the defendant bears the burden of proof.  See *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*[5] ("[W]e conclude that the creditor should be responsible for demonstrating that the consumer provided prior **express consent**.... Should a question arise as to whether express consent was provided, the burden will be on the creditor to show it obtained the necessary prior **express consent**."); see also *Grant v. Capital Mgmt. Servs.*, L.P.[6] (" '[E]xpress consent' is not an element of a TCPA plaintiff's prima facie case, but rather is an affirmative defense for which the defendant bears the burden of proof.").  The ninth circuit has repeatedly found the same.[7]

---

[5] https://docs.fcc.gov/public/attachments/FCC-07-232A1.pdf  Emphasis added.

[6] *Grant v. Capital Mgmt. Servs. L.P.*, No. 11-56200, 3 (9th Cir. Sep. 2, 2011)

[7] *Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037, (9th Cir. 2017) and *Wakefield v. Visalus* Ninth Circuit Court of Appeals Opinion filed on 10/20/2022 affirming "Express consent is . . . an affirmative defense for which the defendant bears the burden of proof".

NATHEN BARTON
4618 NW 11TH CIR
CAMAS WA 98607

# SAHA's Fraud Claim Fails

To the extent SAHA's fraud claim is predicated on the allegation Barton went on a website and requested calls (*Id* at ¶3.7, ¶3.8, ¶4.2, ¶4.4, ¶4.5, ¶4.6), they admit this storyline is false.  They make three backup allegations:

> "Upon receiving the auto-dialed phone call, rather than hanging up or selecting the option to remove his number BARTON opted to contact SAHA."  *Id* at ¶3.10

> and

> "BARTON used a phone he recently purchased and using information in that phone, responded to solicitations meant for the previous owner of the phone number".  *Id* at ¶4.3

> and

> "SAHA is informed and believes and thereon alleges that BARTON opted in on a call on February 15, 2021."  *Id* at ¶4.7.

All of them are legally insufficient for a fraud claim.

**Why "Upon receiving the auto-dialed phone call, rather than hanging up or selecting the option to remove his number BARTON opted to contact SAHA." Fails**

SAHA's first robocall to Barton was illegal.  They have admitted they obtained Plaintiff's phone number from public records and called it without Plaintiff's consent (Exhibit A).

> **INTERROGATORY NO. 15:** In (Plaintiff's Request for) Admission 109, you admitted you purchased the name, address, and phone number for William Wilder from a vendor. What caused you to believe that the recipient of the first phone call you subsequently made to that phone number consented to the call.
>
> **ANSWER:**
>
> *Because we were sending a solicitation from a non-profit organization, it is our understanding we did not need consent; therefore we do not have information on that.*

1    In receiving an illegal call, Barton had no duty to hang up or selecting the option to

2  remove his number.  SAHA is using a fraud claim for what amounts to a mitigation of damages

3  argument.  Barton had no duty to attempt to remove his number or choose not to speak with a

4  SAHA representative.  See *Trim v. Mayvenn, Inc.*[8]:

> Mayvenn further contends Trim's failure to "complain" or "respond with a 'STOP'
> message" upon receiving the first text from Mayvenn shows that she "took steps to allow
> the continuance of the injury while building a record to facilitate a later claim." (See Mot.
> at 10:13-11:2.) Such argument, however, "misstates the injury required to bring a TCPA
> claim and assumes a failure to mitigate statutory damages where no such duty exist[s]."
> See *N.L. v. Credit One Bank, N.A.*, Case No. 2:17-cv-01512-JAM-DB, 2018 WL
> 5880796, at *4 (E.D. Cal. Nov. 8, 2018) (rejecting argument that plaintiff who "allowed
> the calls to continue after consulting with legal counsel" lacked standing to bring TCPA
> claim, affirmed on appeal); see also *Ahmed v. HSBC Bank USA, Nat'l Assoc.*, Case No.
> ED CV 15-2057 FMO (SPx), 2017 WL 5720548, at *2 (C.D. Cal. Nov. 6, 2017) (noting
> "weight of available authority indicates there is no duty to mitigate statutory damages in .
> . . TCPA cases" (internal quotation, citation, and alteration omitted)) (collecting cases)."
> *Trim v. Mayvenn, Inc.*, 20-cv-03917-MMC, 4 (N.D. Cal. Apr. 5, 2022).

12    See also *Powell v. West Asset Management, Inc.*[9] (noting that "in a March 2000

13  Enforcement Action Letter[10], the Federal Communications Commission ("FCC") indicated that

14  the TCPA does not impose a duty to mitigate with respect to the receipt of unsolicited faxes . . .

15  While the FCC Enforcement Action Letter concerns unsolicited faxes, covered under Section

16  227(b)(1)(C), and not unsolicited telephone calls covered under Section 227(b)(1)(A), it is

17  equally persuasive given the similarity of the statutory provisions.").

18    Court after court has held likewise:

19
20
- "the Court finds that the weight of available authority indicates that there is no
  duty to mitigate statutory damages in these cases"[11]

21

---

[8] *Trim v. Mayvenn, Inc.* , 20-cv-03917-MMC, 4 (N.D. Cal. Apr. 5, 2022)

[9] *Powell v. West Asset Management, Inc.*, 773 F. Supp. 2d 761, 764 (N.D. Ill. 2011)

[10] https://transition.fcc.gov/eb/Orders/21c.txt

[11] *Springer v. Fair Isaac Corp.*, No. 14-CV-02238-TLN-AC, 8 (E.D. Cal. Nov. 13, 2015)

NATHEN BARTON
4618 NW 11TH CIR
CAMAS WA 98607

- "This theory misstates the injury required to bring a TCPA claim and assumes a failure to mitigate statutory damages where no such duty existed"[12]

- "Mitigation of damages is not a defense under the TCPA, and each instance of a violation is independently actionable"[13]

- "The TCPA does not expressly include a duty of callees to mitigate the statutorily-prescribed damages by answering or returning telephone calls received from automatic dialing machines and informing the calling entity that it has the incorrect number."[14]

- "There is no duty to mitigate in TCPA cases"[15]

- "Autoflex had no duty to contact . . . and ask them to stop violating the TCPA" [16]

SAHA can't create duty to mitigate TCPA damages via a fraud claim.

**Why "BARTON used a phone he recently purchased and using information in that phone, responded to solicitations meant for the previous owner of the phone number" Fails**

This argument fails for two reasons.  First, they have no evidence that "BARTON used a phone he recently purchased and using information in that phone, responded to solicitations meant for the previous owner of the phone number".  Barton testifies in the associated Declaration that he did not do this (Barton Declaration ¶1) and they have no evidence to the contrary.

Second, as above, Plaintiff had no duty *not* to respond to SAHA's solicitations.

**Why "SAHA is informed and believes and thereon alleges that BARTON opted in on a call on February 15, 2021" Fails**

This argument fails for three reasons.

---

[12] *N.L. v. Credit One Bank*, No. 2:17-CV-01512-JAM-DB, 2 (E.D. Cal. Nov. 8, 2018)

[13] *Holtzman v. Turza*, No. 08 C 2014, 10 (N.D. Ill. Oct. 19, 2010)

[14] *Fillichio v. M.R.S. Ass'ns, Inc.*, No. 09-612629-CIV, 2010 WL 4261442, at *5 (S.D. Fla. Oct. 19, 2010)

[15] *State ex rel. Charvat v. Frye*, 114 Ohio St. 3d 76, 77 (Ohio 2007)

[16] *Manufacturers Auto Leasing, Inc. v. Autoflex Leasing, Inc.*, 139 S.W.3d 342, 344 (Tex. App. 2004)

MOTION FOR SUMMARY JUDGEMENT - 9 / 16                 NATHEN BARTON
CASE NO 3:21-CV-05338-RJB                                        4618 NW 11TH CIR
                                                                              CAMAS WA 98607

- First, '[t]he TCPA exempts from liability automated calls made with the "*prior express consent of the called party.*"'[17]  Barton can't have consented to the February 15 robocall *during* the call – that isn't *prior* express consent of the called party. SAHA – with the burden of consent – makes no showing Barton consented *prior* to the February 15 robocall.

- Second, SAHA – with the burden of consent – makes no showing Barton consented to future calls using *artificial or prerecorded voice*.     47 U.S. Code § 227(b):

"It shall be unlawful for *any* person . . . to make *any* call (other than a call made . . . with the prior express consent of the called party) *using* any automatic telephone dialing system or *an artificial or prerecorded voice* . . . to any telephone number assigned to a paging service, cellular telephone service."  Emphasis added.

SAHA has no evidence that Barton consented to further calls *using artificial or prerecorded voice*, let alone in writing:

"In 2012, the regulations were amended to require that a call using an ATDS or a prerecorded voice—which "introduces an advertisement or constitutes telemarketing," or is made to a "residential line"—must have been made with the "prior express written consent of the called party."" *Williams v. PillPack LLC*, C19-5282 TSZ, 11 (W.D. Wash. Feb. 12, 2021).

SAHA has admitted placing two more such calls to Barton *after* February 15[18] (on February 19 and then again on February 22):

---

[17] *N. L. v. Credit One Bank*, 960 F.3d 1164, 1168 (9th Cir. 2020).  Emphasis added.

[18] Interrogatory #7 is from Exhibit K.

MOTION FOR SUMMARY JUDGEMENT - 10 / 16                    NATHEN BARTON
CASE NO 3:21-CV-05338-RJB                                                4618 NW 11TH CIR
                                                                                      CAMAS WA 98607

21 | **INTERROGATORY NO. 7:**      Between the dates of July 10, 2020 and July 1, 2021, what

22 | is the total number of times you used the autodialer mentioned in your answer to Interrogatory #3

23 | (in the first set of Interrogatories) to initiate a call to (360) 910 1019.

1 | **ANSWER:**
The dialer made to 360-910-1019. Here are the dates & times.  It was placed on the dialer DNC list on

2 | 2-25-21, and there were no subsequent calls thereafter.

| Call ID | Phone | Date | Time | Duration |
|---------|-------|------|------|----------|
| 18446222243 | 13609101019 | 2021-02-15 | 16:49:17.962290-08:00 | 492 |
| 18446222243 | 13609101019 | 2021-02-19 | 16:05:25.801715-08:00 | 86 |
| 18446222243 | 13609101019 | 2021-02-22 | 14:48:40.139507-08:00 | 353 |

- Third, SAHA has *another* consent problem.  47 C.F.R. § 64.1200(d)(4) placed a

  duty on SAHA:

  "A person or entity making an artificial or prerecorded-voice telephone call . . .
  for telemarketing purposes must provide the called party with the name of the
  individual caller, *the name of the person or entity on whose behalf the call is
  being made*".

  According to SAHA's own transcript of the February 15 call (Exhibit E, top of

  page 1), SAHA identified themselves as "Nonprofit Alliance"[19].  SAHA isn't

  "Nonprofit Alliance", they have a *d/b/a* of Nonprofit Alliance of Consumer

  Advocates.  Worse, this d/b/a does not comply with 47 C.F.R. § 64.1200:

  "The FCC clarified that providing a d/b/a in a telemarketing message is
  permissible, but it is insufficient to fully comply with Section 64.1200(d)(4). See
  68 Fed. Reg. at 44163 ("The Commission recognizes that some businesses use
  "d/b/as" or aliases for marketing purposes. *The rule does not prohibit the use of
  such additional information, provided the legal name of the business is also
  stated.*"[20]). Because the Defendants failed to provide the "legal name of the
  business," they ostensibly violated the regulation."[21]

---

[19] The robocall portion didn't identify SAHA by any name.  See Exhibit B ¶10.

[20] https://www.govinfo.gov/content/pkg/FR-2003-07-25/pdf/03-18766.pdf#page=21  Emphasis added.

[21] *Robison v. 7PN, LLC*, 569 F. Supp. 3d 1175, 1185-86 (D. Utah 2021)

1   If SAHA had identified themselves as Walmart, and Plaintiff consented to more calls,

2   that consent would cover future calls from *Walmart*, not SAHA.  According to SAHA's

3   own call transcript (Exhibit E), SAHA can't have obtained Plaintiff's consent to future

4   calls from SAHA.  They never used their actual business name, and they didn't even use

5   their *d/b/a* name – Nonprofit Alliance of Consumer Advocates.

6   ### SAHA's Fraud by Nondisclosure Claim Fails

7   Again, to the extent SAHA's fraud by nondisclosure claim is predicated on the allegation

8   Barton went on a website and requested calls (Dkt. 82 at ¶3.7, ¶3.8, ¶4.2, ¶4.4, ¶4.5, ¶4.6, ¶5.2,

9   ¶5.4), they admit this storyline is false.

10   Their admission (*Id* at ¶3.20) guts their allegation:

11   "SAHA received an email from BARTON after consenting to receive information which
     stated "I am sorry, I am not really interested in loan modification. A couple of days ago I
12   got an illegal robocall and I played along to see who it was and unfortunately, it was you
     folks. I have a mission to get rid of robocalls… if you folks would like to talk it over, I
13   am willing. Otherwise within a few weeks I will be down there for your company."

14   Plaintiff has testified (Plaintiff's Declaration ¶2-¶7) that once he had investigated and

15   identified the source of the robocalls – SAHA – from the email they sent (Exhibit G), he

16   immediately replied telling them he wasn't interested in their services and he gave the reason he

17   spoke to them (Exhibit H).

18   SAHA scraped public records, obtained Barton's phone number, and robocalled Barton

19   on February 15.  Even if during the ensuing conversation Barton *had* consented to further

20   robocalls, Plaintiff's email to SAHA on February 17, 2021 canceled any reason SAHA could

21   believe Barton wanted more robocalls.  When SAHA robocalled Barton *again* on February 19,

22   and *again* on February 22, they did so *after* Barton told them he didn't want their services on

23

24

MOTION FOR SUMMARY JUDGEMENT - 12 / 16                    NATHEN BARTON
CASE NO 3:21-CV-05338-RJB                                 4618 NW 11TH CIR
                                                          CAMAS WA 98607

1  February 17.  Barton did not allege to have received any robocall during any period of time

2  SAHA could claim Barton consented to robocalls.

### SAHA's Negligent Misrepresentation Claim Fails

4  Yet again, to the extent SAHA's fraud by nondisclosure claim is predicated on the

5  allegation Barton went on a website and requested calls (*Id* at ¶3.7, ¶3.8, ¶4.2, ¶4.4, ¶4.5, ¶4.6,

6  ¶5.2, ¶5.4), they admit this storyline is false.

7  SAHA has the same problem as above – he didn't ask for their February 15 robocall, and

8  he emailed them on February 17 telling them he wasn't interested in their services.  Therefore,

9  by the time they robocalled again on February 19 and February 22, they did so days *after* Barton

10 told them he didn't want their services.  Barton did not allege to have received any robocall

11 during any time SAHA could claim Barton consented to robocalls.

### The Burden of Proof on SAHA's Claim

13 Each element of fraud must be established by "clear, cogent and convincing evidence."[22]

14 This is also true in a negligent misrepresentation claim.[23]

15 "Clear, cogent, and convincing evidence" denotes a quantum of evidence or degree of

16 proof greater than a mere preponderance, but something less than proof beyond a reasonable

17

18 doubt.[24]  It is the quantum of evidence sufficient to convince the fact finder that the fact in issue

19 is "highly probable."[25]

20

21

[22] *Stiley v. Block*, 130 Wn. 2d 486, 488 (Wash. 1996)

22 [23] *Lawyers Title Insurance v. Baik*, 147 Wn. 2d 536, 543 (Wash. 2002)

23 [24] *In re Deming*, 108 Wn. 2d 82, 109 (Wash. 1987).  *Tiger Oil Corp. v. Yakima County*, 158 Wn. App. 553, 562 (Wash. Ct. App. 2010)

24 [25] *In re Welfare of Sego*, 82 Wn. 2d 736, 738 (Wash. 1973)

MOTION FOR SUMMARY JUDGEMENT - 13 / 16                     NATHEN BARTON
CASE NO 3:21-CV-05338-RJB                                              4618 NW 11TH CIR
                                                                                  CAMAS WA 98607

1

**SAHA Also Violated Washington State Law**

2

Washington State RCW 80.36.400 ("WADAD") prohibits automatically dialing phone

3

numbers and playing a recorded message.  "No person may use an automatic dialing and

4

announcing device for purposes of commercial solicitation." *Id* at 80.36.400(1)(b)(2).

5

"The text of the WADAD is substantially similar to its federal counterpart, as is its

6

purpose."[26]  "A violation of the WADAD is automatically a violation of the Washington

7

Consumer Protection Act ("WCPA"). See Wash. Rev.Code § 80.36.400(3)."  *Id.*

8

As discussed above, Barton did not consent to the February 15, 2021 robocall.  On

9

February 17 Barton told SAHA he wasn't interested in their services.  SAHA's use of an

10

automatic dialing system and playing of recorded messages to Barton on February 19 and 22 was

11

unsolicited.

12

**Conclusion**

13

SAHA no longer claims Barton went to some website and asked for calls, admitting they

14

scraped public records looking for people who might be receptive to their services.  They thought

15

they found such a person named William Wilder.  Pepe Abad testified (Exhibit C) that when they

16

find a potential customer, they pull all the phone numbers connected to that property and they

17

call them all:

18

> "Then we obtain client contact information from various search engines . . . this provides
19
> us all 'known' associated mobile phone numbers associated with that property address . . .
> We send . . . SMS messages to each record with brief information on our free loan
20
> modification services".  Exhibit C, page 1, lines 18-21

21

22

23

---

24

[26] *Chesbro v. Best Buy Stores, L.P.*, 705 F.3d 913, 919 (9th Cir. 2012)

1  SAHA blasted over five dozen phone numbers with robocalls because they wanted to sell

2  Mr. Wilder a mortgage.  They weren't even trying to reach Mr. Wilder when they blasted

3  Plaintiff, they knowingly and willfully dialed someone they knew *wasn't* Mr. Wilder.

4  Clearly, when SAHA blasts 65 phone numbers trying to reach one person, they know or

5  should have known there would be a lot of collateral damage.  They don't care.

6  SAHA is exactly the reason the TCPA was enacted – to stop telemarketers from blasting

7  over five dozen phone numbers in search of one man.  And to stop them from doing so

8  anonymously.

9  SAHA should not be allowed to openly violate telemarketing law, and then turn around

10  and claim the people they are illegally calling can't investigate to them, learn their identity, and

11  then hold them accountable.

12  Our own circuit recently held 'Congress "establishe[d] the substantive right to be free

13  from certain types of phone calls and texts absent consumer consent . . . [and] identified

14  unsolicited contact as a concrete harm." [27].

15  SAHA can't show by clear, cogent, and convincing evidence that Barton induced SAHA

16  to call him and SAHA suffered injury.  Barton's investigation of SAHA's illegal calls isn't fraud

17  or any of its relatives.  To the extent SAHA was injured by Barton *identifying* them and then

18  *filing suit*, that is the TCPA's purpose.

19  "The statutory damages available under the TCPA are, in fact, specifically designed to
   appeal to plaintiffs' self-interest and to direct that self-interest toward the public good:
20  "like statutory compensation for whistleblowers," they "operate as bounties, increasing
   the incentives for private enforcement of law." *Chapman v. Wagener Equities, Inc.* [28]
21

22

23
[27] *Chennette v. Porch.com* Ninth Circuit 2022

24  [28] *Chapman v. Wagener Equities, Inc.*, 747 F.3d 489, 490 (7th Cir. 2014)

MOTION FOR SUMMARY JUDGEMENT - 15 / 16                    NATHEN BARTON
CASE NO 3:21-CV-05338-RJB                                 4618 NW 11TH CIR
                                                          CAMAS WA 98607

"In creating a private right of action under the TCPA, Congress chose to incent private litigants to enforce the law, rather than having government regulators do it. The fact that Mr. Shelton and other litigants respond to the economic incentives that Congress created is not evidence of misconduct." _Shelton v. FCS Capital LLC_[29].

SAHA's counterclaims should be dismissed.

_____s/ Nathen Barton_____                    _____1/5/2023_____
          (signed)                                              (Dated)


Nathen Barton
(469) 347 2139
4618 NW 11th Cir
Camas WA 98607


CERTIFICATE OF SERVICE

I hereby certify that on January 5, 2023, I caused the foregoing document to be

electronically filed with the Clerk of the Court using the Electronic Filing (CM/ECF) system,

which will send notification of such filing to all counsel of record and all pro se parties registered

to use the CM/ECF system.


_____s/ Nathen Barton_____                    _____1/5/2023_____
          Nathen Barton                                       (Dated)

---

[29] _Shelton v. FCS Capital LLC_, Case No. 2:18-cv-03723-JDW, 5 (E.D. Pa. Jun. 17, 2020)

MOTION FOR SUMMARY JUDGEMENT - 16 / 16                    NATHEN BARTON
CASE NO 3:21-CV-05338-RJB                                      4618 NW 11TH CIR
                                                                 CAMAS WA 98607